IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| BONNIE J. CALDWELL | : |
|                    DEBTOR | : BANKRUPTCY NO. 04-33366 SR |
| | : |
| | : |
| BONNIE J. CALDWELL | : |
|                PLAINTIFF | : |
|      V. | : |
| | : |
| CONTINENTAL AMERICAN INSURANCE | : |
| CO. F/K/A UNITED STATES LIFE INSURANCE | : |
| CO. | : |
|        AND | : |
| | : |
| DISABILITY REINSURANCE MANAGEMENT | : |
| SERVICES, INC. | : |
| | : |
|             DEFENDANTS | : ADV. NO. 05-00111 |
| | : |

OPINION

By:   STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

I.    **Introduction**

Debtor Bonnie J. Caldwell (the "Debtor" or the "Plaintiff") filed this Adversary Proceeding against Defendants Continental American Insurance Co. f/k/a United States Life Insurance Co. ("U.S. Life") and Disability Reinsurance Management Services, Inc. ("DRMS") (collectively, the "Defendants") alleging breach of contract, seeking monetary and equitable relief, and asking the Court to reinstate certain long-term disability benefits. The Defendants oppose the relief requested and have filed three Counterclaims against the Plaintiff seeking declaratory and monetary relief. The Court presided over a trial on this matter on May 31, 2006, following the submission of all post-trial briefs, the Court took the

matter under advisement.  For the reasons discussed below, the Court enters judgment in the favor of the Defendants and against the Plaintiff.

## II.    Background

The Plaintiff is a former U.S. Airways employee who claims she suffers from Lyme Disease and that her illness entitles her to long-term disability benefits under her former company's disability policy.  In 1992, the Plaintiff began working for U.S. Airways as a part-time fleet servicer, a position in which she loaded baggage onto aircraft.  In 1998, the Plaintiff became a full-time fleet servicer with U.S. Airways.  As a full-time employee, she became eligible for long-term disability, and she enrolled in the company's plan.

*The Policy*

The company's long-term disability program is governed by a group disability policy (the "Policy") that defined "Total Disability" or "Totally Disabled" to mean:

> (1) during the first twenty-four (24) months of a period of disability, an injury or sickness required the employee to be under the regular care and attendance of a physician, and prevented her from performing the material duties of her *regular occupation*; and

> (2) after the first twenty-four (24) months of total disability, an injury or sickness prevented her from performing the material duties of *any occupation* for which her education, training and experience qualified her.

*See* Ex. D-2 at 5 (emphasis added).

*Plaintiff's Disability Claim*

On or about February 3, 2003, the Plaintiff submitted a claim for disability benefits under the Policy, asserting that she was disabled as a result of Lyme Disease.  On the authenticated claim form, the Plaintiff specified March 18, 2001 as the "Date of Accident

2

or Date Symptoms First Appeared."  *See* Ex. P-1 § 7.  The claim form also questioned

whether she had ever had the same or similar condition in the past.  The Plaintiff

responded in the negative.  The Plaintiff later testified at trial, however,  that she had been

first diagnosed with Lyme Disease in 1993[1] and tested positive for Lyme Disease in

October 2000.[2]

At the time the Plaintiff submitted her disability claim form, her job responsibilities

as  a fleet servicer included physically demanding work, such as loading and unloading

airplanes, driving airport equipment, and lifting bags and other cargo into aircraft bins.  The

Defendants initially granted the claim and began paying benefits to the Plaintiff in April 2003

in the amount of $1,785.000 per month.  (N.T. 5/31/06 at 19; 103)

*Income From Other Sources*

On August 1, 2003, the Plaintiff executed an Agreement Concerning Benefits

("Agreement") for the Defendant U.S. Life.  (N.T. 5/31/06 at 20).  The Agreement provided

that the benefits would be reduced by any income that the Plaintiff received from other

---

[1] The Plaintiff testified that she was diagnosed positive for Lyme Disease in June 1993.  The Plaintiff testified that, at that time, she became very ill, had what appeared to be a bull's eye rash on the back of her shoulder, and that her symptoms caused her to miss work for two weeks.  Following a visit to her family doctor and two weeks of treatment with medication, the Plaintiff returned to work, believing that the disease had been cured.

[2] The Plaintiff testified that in October 2000, she began noticing weakness and pain in her wrist.  She saw the same family doctor who had earlier diagnosed her with Lyme Disease.  Her doctor did  blood work and told the Plaintiff that her pains were job-related. The Plaintiff then went on light duty at work and engaged in physical therapy with the company doctor for approximately three months.  Her pain continued to get worse until the point that she claims she was not able to lift anything with her right hand and arm.  She also complained of chronic fatigue.  She returned to her family doctor in March 2001, at which time she was told that she had tested positive for Lyme Disease the previous October but he had failed to inform her.  She then began a course of antibiotics to treat her symptoms.

sources, including social security.  The Policy likewise provided in a section addressing other income benefits that "[t]he scheduled amount [of other income benefits] will be reduced by the sum of any income or benefit you receive or for which you are eligible . . . from . . . the Federal Social Security Act."  *See* Ex. D-2 at 8-9.  The Policy further provided that "[i]f you are totally disabled beyond 6 months you must provide proof of application for Social Security Disability Income benefits within 8 months of date of disability in order for your benefits under the Plan to continue so long as total disability continues."  *See id.*

In the Agreement, the Plaintiff elected to receive her monthly long-term disability benefit with no estimated reduction in benefits received from the Social Security Administration ("SSA") but specifically acknowledged that "I understand that this may result in an overpayment on my Long Term Disability claim and agree to repay any overpayment in full immediately following receipt of award for said benefits."  *See* Ex. P-2.  The Policy also provided in pertinent part for the adjustment of benefits in the event of an under or overpayment as follows: "We may reduce your benefit or stop paying benefits until the overpayment is recovered."  *See id.* at 9.  The Plaintiff testified that she understood these provisions to mean that U.S. Life would want to recoup any monthly social security amounts that she received.  (N.T. 5/31/06 at 21)

*Social Security Payments and Allegations of Overpayment*

The Plaintiff applied for social security benefits in July 2003 and received a lump sum award on May 1, 2004 of $7,458.00.  (N.T. 5/31/06 at 21; 29).  At that time, she also received a lump sum award of $5,473.00 from the SSA payable to her as the custodian for her minor daughter.  (N.T. 5/31/06 at 45).  In addition, the Plaintiff received two monthly payments of $1,007.00 each for both April and May 2004 and a monthly payment of

4

$503.00 for May 2004 on behalf of her daughter.  The Plaintiff testified that she notified U.S. Life about the award by contacting them via telephone and speaking to a customer service agent.  (N.T. 5/31/06 at 30).

The Defendants dispute that the Plaintiff notified them of the social security payments and claim that they did not discover that the Plaintiff had received an award from the SSA until June 2004 when they were informed by the agency.  (N.T. 5/31/06 at 106) Furnished with this information, the Defendants adjusted the Plaintiff's monthly disability benefits accordingly.   The Defendants also notified the Plaintiff by letter that an overpayment of $17,617.30 (later adjusted downward) was immediately due.  The Plaintiff refused to reimburse the Defendants for the overpayment, disputing the claimed amount and claiming that, at most, she owed $9,094.00 as a result of an overpayment.  (N.T. 5/31/06 at 36; 45-46)   Because the Plaintiff failed to repay the overpayment, the Defendants suspended her benefits in June 2004.  They subsequently terminated benefits effective April 2005, claiming that the Plaintiff no longer met the definition of "total disability" under the Policy.

Part of the dispute over the amount of overpayment owed stems from amounts that were received from social security for Ms. Caldwell's minor daughter.  The Policy provided how receipt of other income benefits, including social security, would affect the amount of benefits due under the Policy as follows: "Benefits provided to your dependants by reason of your disability or retirement will be considered to be provided to you."  *See* Ex. D-2 at 8-9.  The Plaintiff claims that the portion attributable to her daughter should not be counted as part of any overpayment because her daughter was living with and being cared for by her father for at least a portion of the time that she was receiving social security payments.

(N.T. 5/31/06 at 32)  The Defendants, on the other hand, claim that any benefits provided to the Plaintiff's daughter are deemed to be other income benefits resulting from the Plaintiff's disability that reduce the long-term disability payment payable to the Plaintiff. (N.T. 5/31/06 at 120)

The Defendants have since adjusted downward their claimed amount of overpayment due to their erroneous inclusion in the initial amount of approximately $2,400.00 in attorneys' fees paid to the Plaintiff's disability attorney.  (N.T. 5/31/06 at 108) Because the Defendants were also able to recoup part of the overpayment before the time that they determined that the Plaintiff was no longer eligible for benefits, they now claim that the true amount of overpayment at issue is $12,251.30.  (N.T. 5/31/06 at 112)

*Vocational Assessment and Questionnaire*

As discussed above, the Policy provides that following expiration of the first 24-month period–i.e., as of April 2005–the Plaintiff had to be disabled from *any* occupation, not just her own occupation, to continue receiving disability benefits.  Accordingly, in January 2005, the Defendants informed the Plaintiff that her insurance claim would be cancelled in its entirety effective April 1, 2005 unless she completed a vocational assessment showing that an injury or sickness prevented her from performing the material duties of any occupation for which her education, training and experience qualified her. The Plaintiff refused to complete a vocational assessment but did complete and return an activities-level questionnaire in April 2005.  (N.T. 5/31/06 at 104)  In the questionnaire, the Plaintiff acknowledged that she was able to use a computer, do laundry, and prepare her own meals.  She subsequently testified, however, that she can only do laundry and cook some of the time and that her partner has responsibility for all of the housework and

6

maintaining of the household. (N.T. 5/31/06 at 46-47) By her own admission, the Plaintiff

has made no attempt to find a job since filing her disability claim in 2003. The Defendants

determined that the Plaintiff had at least sedentary work capacity, (N.T. 5/31/06 at 105),

and that, as a result, she did not satisfy the criteria for "total disability" beyond the initial 24-

month period. Accordingly, the Defendants terminated benefits effective April 2005.

*Bankruptcy Filing*

On October 4, 2004, the Plaintiff filed a Voluntary Petition for relief under Chapter

13 of the United States Bankruptcy Code in an effort to stave off a foreclosure sale of her

home following a delinquency in her mortgage payments . On April 14, 2005, the Plaintiff's

case was converted to Chapter 7. On February 11, 2005, the Plaintiff filed an Adversary

Complaint against the Defendants alleging breach of contract, seeking monetary and

equitable relief, and asking the Court to reinstate her long-term disability benefits.

The Defendants filed an Answer, Affirmative Defenses, and Counterclaims to

Plaintiff's Adversary Complaint on April 7, 2005. In three Counterclaims, the Defendants

seek an order declaring that DRMS properly exercised its right of recoupment of the

overpayment received by the Plaintiff from the SSA by suspending benefits, and that such

recoupment did not violate the automatic stay provided by 11 U.S.C. § 362. In addition, the

Defendants seek an order declaring that the overpayment is nondischargeable under either

of two theories: (1) that the Plaintiff obtained the overpayment by false pretenses, false

representation, or actual fraud by misrepresenting her date of initial diagnosis of Lyme

Disease, and/or that the Plaintiff's actions were willful and malicious, making her obligation

to repay the overpayments nondischargeable under 11 U.S.C. § 523(a)(2)(A), 11 U.S.C.

7

§ 523(a)(2)(B), and/or 11 U.S.C. § 523(a)(6),[3] or (2) because the Plaintiff never had the

right in the first place to retain the overpayment, because the funds are not property of the

estate.

To assess these issues, the Court first must determine whether the Plaintiff is

"totally disabled" under the company's long-term disability policy and therefore entitled to

continued long-term disability benefits beyond the initial 24-month period.  Second, the

Court must determine whether the Defendants properly exercised their right of recoupment

to the overpayment that the Plaintiff received from social security by suspending her

benefits as of June 2004.  This second issue further requires the Court to consider the

predicate questions of whether the Defendants' exercise of recoupment violated the

automatic stay; and whether any overpayment debt is nondischargeable in bankruptcy.

The Court shall address each of these issues in turn below.

III.    **Discussion**

A.    **Plaintiff Has Failed To Prove That She Is "Totally Disabled" And That
Defendants Breached Their Contractual Obligation To Pay Benefits**

In her Complaint, the Plaintiff seeks a determination that: (1) the Defendants

breached the Policy by wrongfully terminating her disability benefits, and (2) such benefits

should be reinstated at the rate of $799.00 per month retroactive to July 2004.[4]  As a

---

[3] Although the Defendants cite to all three of the above provisions in their
Counterclaims, their argument is limited to 11 U.S.C. § 523(a)(2)(A).  Accordingly, the
Court will limit its analysis to that provision as well.

[4] The testimony indicates that the Defendants in fact began suspending Plaintiff's
benefits in June– not July– of 2004.  The Plaintiff calculates the $799.00 figure by
deducting the $986.00 social security payment paid to the Plaintiff (excluding payments to
her daughter) from the $1,785.00 monthly disability amount that she was receiving from the
(continued...)

8

threshold matter, the Court must determine whether the Plaintiff is or was "totally disabled" under the Policy, which in turn will determine whether the Defendants were required to continue to pay disability benefits beyond the initial 24-month period.  In considering that question, the Court notes that the Plaintiff bears the burden of proving that she was totally disabled and that the Defendants breached their obligation to pay benefits.  *See, e.g., Doe v. Provident Life and Accident Ins. Co.*, 1997 WL 214796, at *1 (E.D. Pa. April 22, 1997) ("It is beyond cavil that, in an action asserting breach of contract to provide disability benefits, the burden rests with plaintiff to prove that [s]he was totally disabled within the meaning of the policy and to prove that defendant breached its obligation to pay benefits.").

There are two periods of time relevant to the Plaintiff's claims.  The first is the initial 24-month period of disability when the Defendants found that the Plaintiff's injury prevented her from performing her duties as a fleet servicer.[5]  This period extended from April 2003 through April 2005 but was interrupted after the Defendants learned that the Plaintiff had also been receiving other income benefits from the SSA, resulting in an

---

[4](...continued)
Defendants.

[5] Although the Defendants initially granted the Plaintiff's claim, they continued to investigate the specifics of her claim.  Included in that investigation were a number of medical examinations to determine whether the Plaintiff did in fact suffer from Lyme Disease or some other "special condition" such as fibromyalgia or depression, conditions for which the Policy provided limited coverage (up to a maximum disability period of 12 months) *(see* Ex. D-2 at 6).  The evidence presented is inconclusive as to whether fibromyalgia or any other special condition was the cause of the Plaintiff's symptoms. Consequently, the Court will refrain from disturbing the Defendants' initial finding that the Plaintiff suffered from a disability covered under the Policy during the initial 24 month period, and will limit its analysis to whether Plaintiff has proven a disability in the period following the initial 24 months.

overpayment.  In an effort to recoup the overpayment, the Defendants suspended the Plaintiff's benefits beginning in June 2004 and continued to suspend them until the initial period of disability expired in April 2005.  The Court will address the propriety of the Defendants' exercise of recoupment and related issues in Section III.B. of this Opinion below.

The second period is the period following the initial 24-month disability period, from April 2005 onward.  To be eligible for benefits in this second time frame, the Plaintiff's injury or sickness must have prevented her from performing the material duties of any occupation for which her education, training and experience qualify her.  The Court will address in this Section whether the Plaintiff has met the definition of "total disability" as of April 2005.

The Plaintiff maintains that the Defendants wrongfully terminated her disability benefits and that she remains disabled by Lyme Disease to an extent that prevents her from performing the material duties of any occupation for which her education, training and experience qualify her.  The Defendants, on the other hand, contend that the Plaintiff has not met her burden of proving that she suffers from Lyme Disease or any other condition that prevents her from performing the material duties of any occupation for which she is qualified.  For those reasons, the Defendants maintain that they properly terminated the Plaintiff's coverage.

1.    *No Reliable Evidence of Lyme Disease*

Both parties presented expert testimony regarding the proper testing for Lyme Disease and the diagnosis of the Plaintiff.  In general, the experts agree that the Plaintiff claims to suffer from various symptoms including, *inter alia,* chronic fatigue, pain and sleep

10

problems and that she has undergone various testing for Lyme Disease. The experts, however, dispute the efficacy of the tests for Lyme Disease and the ultimate diagnosis of the Plaintiff.

To date, the Plaintiff has undergone two known tests for Lyme Disease: (1) the PCR test; and (2) a blood test from the Center for Disease Control ("CDC") known as the Western Blot.  The Plaintiff has undergone the PCR test 17 times, resulting in four positive tests and thirteen negative  tests for Lyme Disease.  In addition, the Plaintiff has undergone the Western Blot test nine times, resulting in one positive test in October 2000 (N.T. 5/31/06 at 76) and eight negative tests for Lyme Disease.

The parties' respective experts dispute the value and proper administration of the tests.  For example, the Defendants note that the PCR test has not been approved for testing of Lyme Disease, nor any other disease, and is considered experimental.  (N.T. 5/31/06 at 75)  The Defendants argue that the PCR test is not generally accepted in the mainstream medical community and that it notoriously generates inconsistent and false positive results.  As a result, the Defendants maintain that the PCR tests lack the requisite degree of reliability necessary to satisfy the standard enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).

The Plaintiff's expert, Dr. Peter Fabulian, opined that the Plaintiff suffers from Lyme Disease.  He bases his opinion primarily on the one positive Western Blot test from October 2000 and his own treatment of the Plaintiff since June 2003.  Although board certified in family medicine, Dr. Fabulian was proffered as an expert in infectious diseases.  (N.T. 5/31/06 at 52)  His claimed expertise stems from his treatment of approximately three to four hundred Lyme Disease patients per month.  (N.T. 5/31/06 at 52-53; 59; 73)

11

By all accounts, Dr. Fabulian is a zealous advocate for patients he believes the "mainstream" medical community has failed to properly diagnose with Lyme Disease. He contends that Lyme Disease is a much larger problem than mainstream doctors are willing to recognize. According to Dr. Fabulian, many of his patients came to him after becoming dissatisfied with their regular doctors and find reassurance in Dr. Fabulian's diagnosis of Lyme Disease.

Dr. Fabulian began treating the Plaintiff as a patient in June 2003 when she came to him complaining of achiness and joint pain. (N.T. 5/31/06 at 57-58). Based on her symptoms and the one positive Western Blot test taken nearly three years earlier in October 2000, Dr. Fabulian diagnosed the Plaintiff with Lyme Disease, a position he echoes in his expert opinion in this matter. It is less clear whether Dr. Fabulian also relies on the PCR tests in reaching his conclusion. In his report, he claims that "positive urine and blood PCR's are used extensively by the 'mainstream Lyme and infectious disease experts' so it certainly is recognized." *See* Ex. 9-22 at ¶¶ 1, 9. He also testified that he trusts the PCR test because it finds a bacteria and it is acceptable to insurance companies as being indicative of disease. On cross-examination, however, Dr. Fabulian appeared to distance himself from PCR testing, stating that the test "has not been approved for anything, it's experimental" and that he does not use the test because it has not been recognized by the CDC. (N.T. 5/31/06 at 75)

Dr. Thomas A. Reeder. M.D. testified for the defense. He is board certified in internal medicine and is employed as a medical consultant by DRMS. (N.T. 5/31/06 at 84) Dr. Reeder disputes that the Plaintiff is currently afflicted with Lyme Disease and believes that there has been no evidence by history, clinical examination, or laboratory testing that

12

the Plaintiff ever suffered from Lyme Disease. The Defendants further dispute that injury or sickness prevents the Plaintiff from performing the material duties of any occupation for which her education, training and experience qualify her. Dr. Reeder never examined the Plaintiff but rather based his opinions and conclusions solely on his examination of the Plaintiff's medical records.[6]  (N.T. 5/31/06 at 85; 93-94)  Based on a review of those records, Dr. Reeder concluded that the Plaintiff does not suffer from Lyme Disease although there is evidence that she suffered from fibromyalgia, premenstrual dysphoric disorder, depression, and a benign thyroid nodule that did not impair thyroid function. (N.T. 5/31/06 at 86)

In addition, Dr. Reeder disputes both Dr. Fabulian's methodology and his diagnosis of the Plaintiff. Dr. Reeder challenges Dr. Fabulian's methodology on three grounds. First, he criticizes Dr. Fabulian's reliance on the October 2000 Western Blot test that was not administered in accordance with the CDC's recommended testing sequence. The CDC recommends that an initial antibody screen be performed and, only if the screen is positive, for the patient then to undergo a Western Blot test.  (N.T. 5/31/06 at 87)  If the antibody screen is negative, the CDC does not recommend the Western Blot test. This procedure was not followed in the October 2000 test of the Plaintiff, but rather the Western Blot test was administered alone.  (N.T. 5/31/06 at 86-87).

---

[6] The Plaintiff argues that because Dr. Reeder did not personally examine her, his testimony is inherently less credible than that of Dr. Fabulian who did examine her. The Court disagrees. Not only is a personal examination not required by Fed. R. Evid. 703, *see In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 762 (3d Cir. 1994) ("evaluation of the patient's medical records, like the performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical evaluation."), the Court finds that Dr. Reeder was able to effectively evaluate the Plaintiff's medical condition absent a physical exam.

Second, Dr. Reeder argues that the Plaintiff did not have the clinical picture consistent with Lyme Disease. (N.T. 5/31/06 at 87) According to Dr. Reeder, although the Plaintiff lives in Eastern Pennsylvania, an area where Lyme Disease is present, she did not exhibit any other clinical reasons to suspect Lyme Disease, such as involvement in activities that would have exposed her to ticks that transmit Lyme Disease, such as working out in the woods or in the fields, as well as flu-like symptoms, muscle aches, joint pains, fatigues, a low-grade fever (perhaps), and a rash called erythema migrans. (N.T. 5/31/06 at 87) Based on Dr. Reeder's review of the medical records, although symptoms were reported, none that were consistent with an acute Lyme infection were present. (N.T. 5/31/06 at 88)

Third, Dr. Reeder argues that the testing of the Plaintiff's IgM bands in 2000 was faulty. Testing under the IgM portion of the Western Blot test would only be appropriate when the test is performed within a narrow, one-month window after the Plaintiff had been infected. There has been no evidence that the Plaintiff was infected by a tick bite within a month of the October 2000 test and, in fact, the Plaintiff claims that she was infected with Lyme Disease as far back as 1993. The CDC specifically recommends against using the Western Blot in individuals who have chronic or late stage Lyme Disease because the incidence of false positivity of IgM bands is high and one would not expect the persistence of IgM antibodies beyond a few weeks after the initial Lyme infection; by that time, IgG bands should be present.[7] (N.T. 5/31/06 at 88) An IgG test was performed at the same

---

[7] Dr. Fabulian disagrees with the CDC literature stating a positive IgM response without a positive IgG response is generally of limited diagnostic value if the specimen was obtained more than one month after the disease onset, and testified that what he has seen

(continued...)

time which came back negative.  (N.T. 5/31/06 at 88)

Before comparing the experts' diverging views, the Court must make a preliminary finding that each expert's opinion meets the requirements of Fed. R. Evid. 702.  Rule 702 allows a witness to testify as an expert if scientific, technical or other specialized knowledge will assist the trier of fact.  The witness must be qualified as an expert by knowledge, skill, experience, training, or education, and the witness may testify in the form of an opinion or otherwise "if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

In applying Rule 702, the Third Circuit Court of Appeals has developed a three part analysis.  *See Crisomia v. Parkway Mortgage, Inc. (In re Crisomia)*, 286 B.R. 604, 608 (Bankr. E.D. Pa. 2002) (citing *Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-43 (3d Cir. 1994)) (identifying the three requirements as "qualifications," "reliability," and "fit").  First, the witness must be an expert.  *Crisomia,* 286 B.R. at 608.  The Third Circuit has interpreted this requirement liberally, holding "[t]hat a broad range of knowledge, skills, and training qualify an expert as such."  *Id. (*citations omitted)  The third determination requires that an expert's opinion be relevant.  *Id.* at 610.

The second requirement, referred to as the reliability test, requires the Court to perform a general gatekeeping function to determine if an expert's opinions are reliable.  *Id. (*citing *Daubert*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469).  The following factors, enunciated first in *Daubert,* and later expanded by the Third Circuit, have been

_____

[7](...continued)
in his practice does not conform to that conclusion.  (N.T. 5/31/06 at 77-78)

found probative of reliability: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (6) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* (citing *Paoli*, 35 F.3d at 724 n. 8)

The factors relevant to determining reliability should be applied to the principles and methodologies rather than to the expert's opinions. *Crisomia*, 286 B.R. at 608 (citing *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786). "For an opinion to be reliable, the opinion must be grounded in principles and methodology of the relevant discipline, no matter how impressive the expert's credentials may be." *Crisomia*, 286 B.R. at 608 (citations omitted). The mere fact that an expert states that a methodology is valid does not require the Court to admit opinion evidence based on methodology. *Id.*; *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997) (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp.2d 434, 527 (W.D. Pa. 2003) (citations omitted) ("When an expert's testimony 'relies in part on his own *ipse dixit,* rather than on something more readily verifiable . . .it is open to attack.'" . . . "[S]omething doesn't become 'scientific knowledge' just because it is uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive."). Hence, an opinion, albeit based on training and experience, without

16

more, is unreliable because it is not based on applicable principles and methodologies. *Crisomia*, 286 B.R. at 609 (citations omitted).

In this case, it is clear that Dr. Reeder's opinion meets the reliability factors set out in *Daubert* and *Crisomia*, and the Court need not address them in detail.[8]   More problematic, however, is the opinion of Dr. Fabulian.   Dr. Fabulian's reliance on the October 2000 Western Blot test is flawed.   The Defendants' expert, Dr. Reeder, does an effective job highlighting the areas of fault with Dr. Fabulian's  methodology.   First, as detailed above, the Western Blot that Dr. Fabulian relies on failed to follow the appropriate testing sequence recommended by the CDC.[9]   (N.T. 5/31/06 at 86-87).   Second, to the extent that Dr. Fabulian is relying on positive PCR tests of the Plaintiff, the Court finds that the PCR tests lack the requisite degree of reliability necessary under *Daubert*.   Similarly, Dr. Fabulian's shortcomings with respect to the clinical picture and the IgM testing cast significant doubt on the reliability of his opinion because it is based, in part, on those principles and methodology.   Regardless of whether any one of these issues would prevent the elements of *Daubert* from being met, the Court finds that collectively they render Dr. Fabulian's opinion unreliable.

In sum, therefore, the Court agrees with Dr. Reeder's conclusions that Dr. Fabulian's reliance on the Western Blot test taken in 2000 failed to adhere to the proper

---

[8] The Court finds that the first and third *Crisomia* factors have been satisfied; i.e, both Dr. Fabulian and Dr. Reeder qualify as experts and both have proffered relevant opinions.  Thus, the Court limits its discussion here to the second factor requiring reliability.

[9] Moreover, even if Dr. Fabulian had followed the proper testing sequence, a positive Western Blot test taken in October 2000 does not compel the conclusion that the Plaintiff is still positive or that she is disabled by the disease now six years later.

testing sequence; the IgM results were most consistent with false positive tests; and the absence of IgG bands, coupled with a clinical picture not consistent with acute Lyme Disease, makes Dr. Fabulian's methodology unreliable and inconsistent with evidence of chronic Lyme infection.  (N.T. 5/31/06 at 89).  Moreover, this Court will not adopt Dr. Fabulian's diagnosis of Lyme Disease based on sheer *ipse dixit* or his adamant belief that the Plaintiff suffers from Lyme Disease.  Absent reliable methodology behind his conclusions, the Court will not adopt his opinions.[10]   Consequently, the Court finds that the Plaintiff has failed to meet her burden of proving with reliable evidence that she suffers from Lyme Disease.

2.    *Regardless of Whether Plaintiff Suffers from Lyme Disease, the Evidence Fails to Support a Finding that Plaintiff Is Totally Disabled*

Even if the Court were to find sufficient evidence to support the conclusion that the Plaintiff suffers from Lyme Disease, the Plaintiff still has failed to establish that her condition prevents her from performing the material duties of *any* occupation for which she is qualified.    For example, the Plaintiff completed an activities-level questionnaire in April 2005 acknowledging that she could perform household activities consistent with work including laundry, meal preparation, housekeeping, grocery shopping, driving and yard care as well as use of a computer.  (See Ex. D-1; N.T. 5/31/06 at 91; 46)  These activities suggest to the Court that the Plaintiff could potentially perform the responsibilities of more

---

[10] Dr. Reeder further opined that it is more probable that the Plaintiff's symptoms (such as chronic pain, joint pain, fatigue and poor sleep) are caused by depression or fibromyalgia than by Lyme disease.  (N.T. 5/31/06 at 90).  Again, the Court finds that the evidence before it is insufficient for it to rule on whether Plaintiff's symptoms are caused by fibromyalgia or any other "special condition" under the Policy.    Suffice it to say, however, that the Plaintiff has not met her burden of proving that she was totally disabled by any ailment that she may be suffering from.

18

sedentary work.  Moreover, the Court finds these questionnaire answers more credible than the Plaintiff's later, self-serving testimony to the contrary.

In addition, the Court emphasizes that the Plaintiff  refused to undergo a vocational assessment offered by her employer that would have determined the types of job duties she could or could not perform.  The Plaintiff's refusal to learn what duties she might be able to do should not inure to her benefit now that he claims she can do none.  Based on the above, the Court finds that the Plaintiff has failed to meet her burden of establishing that she is totally disabled for the period after April 2005.[11]  Consequently, the Defendants did not breach any agreement to provide benefits for that period.

### B. Defendants Properly Exercised Their Right To Recoup The Overpayment; Defendants Did Not Act In Violation Of The Automatic Stay Provided By 11 U.S.C. § 362; But The Debt Is Dischargeable

The Defendants argue that they properly suspended the Plaintiff's benefits beginning in June 2003 to recoup the social security overpayment received by the Plaintiff. They now seek a determination from this Court that (1) they had a valid right of recoupment against the Plaintiff that was not subject to the automatic stay, and (2) the

---

[11] The Court further notes that it need not adopt the collateral determination by the SSA awarding benefits as reliable evidence that the Plaintiff is "totally disabled" under the Policy.  Although the Third Circuit has held that a determination by another government agency that a claimant is disabled is entitled to substantial weight before the Secretary of Health and Human Services, *see Somenski v. Barnhart*, 2006 WL 494997, at *9 (E.D. Pa. Feb. 28, 2006) (citing *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985)), that holding is not binding on the issue before this Court, particularly considering that the Policy at issue and the SSA operate under different standards.  *See, e.g., Zimbalist v. Richardson*, 334 F. Supp. 1350, 1355 (E.D.N.Y. 1971).  *Compare Lewis v. Califano*, 616 F.2d 73 (3d Cir. 1980) (holding in a case where the court was reviewing a disability determination by the Secretary of Health, Education and Welfare that the agency finding must be accepted as conclusive if supported by substantial evidence).  Rather, the Court must evaluate the facts and evidence before it.  Based on those, the Court finds that the Plaintiff has failed to prove total disability.

remaining overpayment indebtedness owed by the Plaintiff is nondischargeable in bankruptcy.

### 1.   Valid Right of Recoupment Not Subject to Automatic Stay

The Court finds that the Defendants properly exercised their right of recoupment against the Plaintiff.  The common law doctrine of recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim."  4 COLLIER ON BANKRUPTCY § 553.03, at 553-15-17.  Recoupment "does not require a mutuality of obligation, but rather countervailing claims or demands arising out of the same transaction under which the initial claim was asserted."  *See Long Term Disability Plan of Hoffman-LaRoche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 241 (Bankr. D.N.J. 1989)  The distinction between setoff (a doctrine limited by the Bankruptcy Code) and recoupment is whether the claim arises out of the same or different transactions.  *Id.*  So long as the creditor's claim arises out of the same transaction as the debtor's, that claim may be offset against the debt owed to the debtor without concern for the limitations the Bankruptcy Code places on the setoff doctrine.  *See In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990).   Here, the Defendants argue that their recoupment of the overpayment resulting from payments that the Plaintiff received from the SSA arises out of the same contracts (the Policy and Agreement) under which the Plaintiff is asserting her claim for continuation of benefits.  The Defendants point to *In re Hiler* for support.  The Court finds *Hiler* persuasive and will apply its reasoning to the instant case.

In *Hiler*, a long-term disability plan sought a determination that the plan had a valid right to recoupment against a debtor who received an overpayment of social security

benefits, that such recoupment was not subject to the automatic stay, and that the indebtedness of the debtor to the plan was nondischargeable. *Hiler*, 99 B.R. at 239. The debtor in *Hiler* was declared totally disabled under a disability plan that provided for a reduction in the payment of benefits by contributions received from outside sources such as social security. As in the instant case, the debtor in *Hiler* signed reimbursement agreements agreeing to repay the plan any and all benefits received from social security and to inform the plan of any social security determinations. *Id.* at 240. The debtor received social security benefits, but failed to notify the plan, resulting in an overpayment. *Id.* at 240-241. After the plan learned on its own of the social security award, it began to recoup the overpayment balance due out of the debtor's monthly benefit amount . *Id.* at 241. The debtor subsequently filed for bankruptcy protection.

The *Hiler* court found that the plan had a valid right to recoupment against the debtor because the plan's claim for reimbursement of the overpayment stemmed from the same contract under which the debtor was seeking benefits. *Id.* at 244. The court found that the debtor must accept the burdens of the contract if he wants to continue to receive the benefits of it.[12] *Id.* (". . . in the case where overpayments are made under a contract which provides for recoupment prior to the filing of a bankruptcy petition, the debtor should not be allowed to avoid the burden of reimbursement of such sums by having them

---

[12] The *Hiler* court observed that a majority of bankruptcy courts have allowed creditors to recoup amounts owed by the debtor for pre-petition debts from payments to debtor for post-petition earnings under one of two theories. *Hiler*, 99 B.R. at 243. The first is an application of the concept of executory contracts in bankruptcy which determines that a debtor cannot accept the benefits of a contract without also accepting its intrinsic burdens. *Id.* Under the second theory, courts have found that the interest of a creditor asserting a valid right of recoupment is not property of the debtor's estate. *Id.*

discharged in bankruptcy while he continues to receive the benefits under the same contract. A debtor simply may not assume part of the agreement and reject another.").

As in *Hiler*, the Court finds here that the Defendants' claim for reimbursement for overpayment stems from the same contracts under which the Plaintiff is now asserting her claim for disability benefits (i.e., the Policy and Agreement Concerning Benefits). The contracts provided for recoupment in the event of overpayment. *See* Ex. D-2 at 9 (Policy) and Ex P-2 (Agreement). Indeed, the Debtor expressly agreed under the Agreement to repay in full any overpayment immediately resulting from her receipt of social security benefits, and agreed to notify the Defendants of any social security determinations. *See* Ex. P-2. Moreover, the Plaintiff testified at trial that she understood the provisions meant that the Defendants could recoup form her any overpayment that resulted from her receipt of social security benefits. (N.T. 5/31/06 at 21) The Court sees no reason why the Plaintiff should be able to seek the contract's benefit of continuation of disability benefits without also bearing its burden of reimbursement of an overpayment from other income sources.

The Plaintiff attempts to distinguish *Hiler* by arguing that the instant case is more similar to the facts of *Lee v. Schweiker*, 739 F.2d 870 (3d Cir. 1984) and *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065 (3d Cir. 1992).[13] The Court finds those cases readily distinguishable.

---

[13] The Plaintiff also claims that *Hiler* is distinguishable because the Defendants in the instant case breached the underlying contract by making small miscalculations of the overpayment such as erroneously including attorney's fees in the overpayment amount, and therefore the contract lacked mutuality. The Court finds this argument entirely unpersuasive for a number of reasons. One, even assuming arguendo that a breach defeated mutuality, the Defendants' breaches were non-material. Two, the Defendants subsequently cured all of their miscalculations. And, three, to the extent that there was a

(continued...)

In *Lee*, the debtor challenged the SSA's withholding of amounts of an alleged overpayment both prior to and after the filing of the bankruptcy petition. The court held that the SSA was not entitled to recoup the overpayments post-petition and that its continued deduction of benefits after the filing violated the automatic stay. In so holding, however, the court specifically distinguished cases involving recoupment by insurers post-petition of overpayments under a *contract* providing for such recoupment benefits from cases involving government benefits under a social welfare statute. The Court reasoned that social welfare payments, like social security, are statutory "entitlements" rather than contractual rights. *Id.* at 876. Thus, the court held that once a bankruptcy petition is filed, the income provided by social security benefits should be protected by the automatic stay, and the SSA had no right to recoup previous overpayments made to the debtor. *Id.* at 876. Likewise, the Plaintiff's case is governed not by a social welfare statute but by a contract between the parties. As a result, <u>Lee</u> does not apply.

In *University Medical Center*, the Department of Health and Human Services (HHS) sought to recover 1985 pre-petition Medicare provider reimbursement overpayments by withholding payments for 1988 Medicare services rendered post-petition without violating the automatic stay. The governing regulations stated that each provider cost year was subject to an annual audit that followed the submission of a separate cost report for each fiscal year. *Id.* at 1081. The court had to determine whether the 1985 overpayments were part of the same transaction as UMC's claims for 1988 reimbursement. *Id.* at 1081. The

---

[13](...continued)
material breach, the Plaintiff was the offender, as she breached the Agreement by failing to repay the overpayment as agreed despite acknowledging that certain amounts were due.

court found that the reimbursement payments made for any one year arise from transactions wholly distinct from reimbursement payments made for subsequent years, therefore holding that the claims were not part of a "single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* at 1081.  As a result, the court held that recoupment violated the automatic stay. *Id.* at 1082.  In the instant case, by contrast, there is no such micro-contract situation.  Rather, the evidence supports that there was a single, integrated transaction between the parties.[14]  Hence, the Court finds the facts of *University Medical Center* also distinguishable from the facts at bar.  Consequently, the Court holds that the Defendants had a valid right of recoupment against the Debtor and that such right was not subject to the automatic stay.

2.   Amount of Overpayment

Finding that the Defendants had a valid right of recoupment, the Court must next determine the amount of overpayment due.  The Defendants claim that they are entitled to recoup an overpayment in the amount of $12,251.00.  The Plaintiff, on the other hand, claims that no more than $8,947.30 (*see* Joint Pretrial Statement) is owed.[15]  The

---

[14] The Court also finds misplaced the Plaintiff's reliance on a series of 9th Circuit decisions–which rely on a more liberal "logical relationship" standard to determine whether claims arise out of the same transaction, a standard that has been explicitly rejected by the Third Circuit – as well as others addressing the issue of whether separate transactions were involved. *See, e.g., In re TLC Hospitals, Inc.*, 224 F.3d 1008 (9th Cir. 2000); *In re Madigan*, 270 B.R. 749 (9th Cir. 2001); *In re B & L Oil Co. v. Appel*, 782 F.2d 155 (10th Cir. 1986).  Indisputably, what is present here is a single contract for disability benefits; thus, the same transaction requirement for recoupment has been satisfied.

[15] At a minimum, Plaintiff admits that this amount is owed.  By failing to repay the amount, as contractually provided for, the Plaintiff breached the Agreement.  Moreover, to
(continued...)

24

Defendants base their calculation on an estimated monthly benefit amount of $306.00,[16] approximately $2,880.00 of which they claim to have already recouped.

The evidence concerning social security payments is as follows.  The Plaintiff initially received a lump sum from the SSA of $12,931.00, comprised of $7,458.00 payable to her and $5,473.00 for her minor daughter.  *(See* N.T. 5/31/06 at 21, 29, 45).  The SSA also paid Plaintiff two monthly payments of $1,007.00 each and one monthly payment of $503.00 to her daughter.  Thus, before the Defendants adjusted the Plaintiff's benefits in June 2004 to account for her social security income, the SSA had already paid out to the Plaintiff a total of $15,448.00, consisting of $9,472.00 directly on the Plaintiff's behalf and $5,976.00 on her daughter's behalf.  The Plaintiff contends that she ceased receiving a dependant award from the SSA on her daughter's behalf in September 2004.

The Plaintiff argues that the social security benefit payments made for the benefit of her child should not be included in the overpayment amount because her child was living with and being cared for by her father for at least some of the relevant time period. The Policy provides that "[b]enefits provided to your dependents by reason of your disability or retirement will be considered to be provided to you."  *See* Ex. D-2 at 8-9.  The Plaintiff argues that, because the word "dependent" is not defined in the Policy, the

---

[15](...continued)
the extent that the Plaintiff failed to promptly notify the Defendants of her receipt of social security benefits, the Court finds that she additionally breached her obligations under the Agreement.

[16] The Defendants calculate the $306.00 amount by deducting the $986.00 social security payment to the Plaintiff, as well as the $493.00 payment to the Plaintiff's daughter, from the $1,785.00 disability benefit amount.   The Plaintiff's calculation of $799.00, by contrast, are based on only a deduction of her social security amount and exclude her daughter's payments.

ambiguity must be construed against the Defendants as the drafter of the Policy and in favor of the Plaintiff as the insured.

The pertinent facts are as follows.  The Plaintiff admits that she has had legal custody of her daughter since she was a minor and that there has never been any formal change to that earlier custody order.  (N.T. 5/31/06 at 32-34).  Still, the Plaintiff testified that at the time she received the social security award, her daughter had been living with her father for approximately nine months.  The Plaintiff further testified that she turned over some or all of the first lump sum social security allotted for her child to the father.  (N.T. 5/31/06 at 33-35)  The Plaintiff testified that, after the initial lump sum payment, the payments for her daughter were sent directly to the father.  (N.T. 5/31/06 at 35).  Although legal custody does not appear in dispute, the Plaintiff's testimony concerning her daughter's physical custody with her father as well as other factors such as who was providing financial support to the minor at the time in question raise some ambiguities as to whether the child was the Plaintiff's dependent at the time she received the social security payments.  Dependency is not necessarily defined as legal custody, and the Court will not construe it as such where the Policy here is silent on the definition of  "dependent."  Because the Court finds the term ambiguous, the Court will construe it against the Defendants, as the drafters of the Policy, and in favor of the Plaintiff.  *See, e.g., Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d  100, 106 (Pa. 1999) ("Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.")  As a result, the Court will exclude the amounts paid directly to or on behalf of the Plaintiff's daughter for purposes of calculating the overpayment owed by the Plaintiff in this case.

26

Turning to the calculation, the Court finds that the Plaintiff owes an overpayment of $8,228.00 to the Defendants.   The Court has calculated that figure as follows.  The Plaintiff received initial lump sum payments from the SSA of $7,458.00 payable to her and $5,473.00 for her daughter.  Of the $5,473.00 allocated for her daughter, the Plaintiff acknowledges that she owes Defendants $1,636.00 of that lump sum to compensate for a short period of time that her daughter was living with the Plaintiff following her receipt of the benefits before the daughter moved in with her father in September 2003.   Hence, the Plaintiff owes the $7,458.00 paid to her as well as $1,636,00 allotted for the child, which totals $9,094.00.  Due to the ambiguity in the contract, the Court will disallow the remaining $3,837.00 paid on the child's behalf because it is not clear whether the child should be considered a dependent under the Policy once she went to live with her father. To the $9,094.00, the Court adds the two $1,007.00 payments made to Plaintiff by the SSA, for a new total of $11,108.00.  Again, the Court will exclude the $503.00 payment made to or on behalf of the child.  Out of the $11,108.00 figure, however, the Court must deduct the $2,880.00 that the Defendants have already recouped by suspending the Plaintiff's benefits from June 2004 through April 2005.[17]  That leaves an overpayment of $8,228.00.

3.    Dischargeablility

Finally, the Court must determine whether the overpayment debt is nondischargeable.   The Defendants argue that the Plaintiff's overpayment debt is nondischargeable because (1) it was incurred as a result of false pretenses, false

---

[17] These figures already take into account the deduction of legal fees that the Defendants erroneously included in their initial estimate.

representations and/or actual fraud, or, alternatively, (2) because it is not property of the

estate. The Court finds that the Defendants have not met their burden under either theory.

As to the first theory, the Defendants argue that the Plaintiff's obligation to return

the overpayment is nondischargebale under 11 U.S.C. § 523(a)(2)(A) because it was

obtained by false pretenses, false representation, or actual fraud. Specifically, Defendants

claim that the Plaintiff engaged in misrepresentation and fraudulent conduct by indicating

on the claim form submitted to the Defendants that her symptoms first appeared on March

18, 2001 and not answering truthfully that she had been tested for Lyme Disease in

October 2000 and had first been diagnosed with the disease in 1993.

A creditor seeking to except debt from discharge under section 523(a)(2)(A) bears

the burden of proving that the debt should not be discharged by a preponderance of the

evidence. *See Bank One Columbus, N.A. v. McDonald*, 177 B.R. 215 (Bankr. E.D. Pa.

1994). That burden can be met by proving each of the following elements: (1) that the

debtor made representations; (2) that at the time she knew were false; (3) that she made

them with the intention and purpose of deceiving the creditor; (4) that the creditor relied

on such representations; and (5) that the creditor sustained the alleged loss and damages

as a proximate result of the representations having been made. *See In re Weiler*, 244

B.R. 305, 307-308 (Bankr. E.D. Pa. 2000). It is well established that the provisions of

Section 523 are to be strictly construed against creditors and liberally construed in favor

of debtors, because of the Bankruptcy purpose of granting debtors a fresh start. *In re

Cohn* 54 F.3d 1108 (3d Cir. 1995) Here, the Defendants admittedly only "speculate" that

the Plaintiff misrepresented the above facts in order to get around the Policy's provision

28

regarding pre-existing conditions. (*See* Defendants' brief, at 23) This is understandable, as an alternative reasonable inference that might be drawn is that the Plaintiff believed that her symptoms at the time she completed the questionnaire were the result of a new infection and not a pre-existing condition. As the evidence on this point is thin, and highly inconclusive, the Court concludes that it is insufficient to establish the element of intent which is critical to the Defendants' cause of action. Thus, the Court concludes that the Defendants have failed to meet their burden of persuasion and the overpayment will not be declared non-dischargeable under 11 U.S. C. § 523(a)(2)(A).[18]

As to their second theory, the Defendants argue that the overpayment was never rightfully the Debtor's property and therefore she has no right to retain it. (*See* Defendants' Brief, at 22). The Defendants again base their argument on *Hiler*. The *Hiler* court held that "in the case where overpayments are made under a contract which provides for recoupment prior to the filing of a bankruptcy petition, the debtor should not be allowed to avoid the reimbursement of such claims by having them discharged in bankruptcy while he continues to receive the benefits under the same contract." *Hiler*, 99 B.R. at 241-42. The *Hiler* court went on to reason:

---

[18] Notably, it is at a minimum, inconsistent for the Defendants to argue that the Plaintiff fraudulently failed to disclose a pre-existing condition (i.e., lyme disease) when they insist that the plaintiff does not suffer from lyme disease in the first place. The Court notes also that in their counterclaim the Defendants also assert that the overpayment is non-dischargeable under 11 U.S.C. § 523 (a)(2)(B). They do not address this issue in their post-trial submission, but their pleading indicates that their position is based on the Plaintiff's alleged failure to disclose her receipt of social security benefits. The Defendants' pleading fails to recite what "writing" was involved with the alleged non-disclosure such as might implicate the provisions of 11 U.S.C. § 523 (a)(2)(B) and there does not seem to be any. This cause of action appears to fail on that basis alone.

> To allow the [d]ebtor to side-step the [disability plan's] right would unjustly enrich [the debtor's] estate as well as provide a windfall to all the other creditors at the expense of the [p]lan. Discharge in bankruptcy is intended to provide a debtor with a fresh start, not a head start.  If [the debtor] were permitted to have the overpayments made to him by the [p]lan discharged in bankruptcy, he would be retaining property that was never his, and in effect be getting a head start.  To avoid such a result, [the debtor's] claim to future benefits as property of the estate is subject to the [p]lan's valid right of recoupment.  Thus, to the extent that the [p]lan's right to recoupment is not property of the estate, the dollar value of that right is non-dischargeable.

*Hiler*, 99 B.R. at 244-245.

The Defendants suggest that the above reasoning makes the Debtor's overpayment debt nondischargeable–regardless of whether she has a valid claim to continued benefits under the Policy.  A critical aspect of the *Hiler* court's ruling, however, was that a debtor could not have his overpayment obligations discharged *while he continues to receive the benefits under the same contract*.  Doing so, said the Court,  would give a debtor a "head start."  In the instant case, by contrast, this Court has found that the Debtor is not entitled to <u>any</u> benefits under the Policy going forward.  There being no claim to future benefits, the Defendants have no property in which the Debtor has an interest and from which they can continue to recoup the overpayment.

The debt that remains therefore becomes nondischargeable only if the criteria of § 523(a) have been met.  As discussed above, the Defendants have failed to meet their burden under that provision.  Consequently, the Court holds that the $8,228.00 balance of the overpayment is dischargeable.

An appropriate Order follows.

By the Court:


Stephen Raslavich
United States Bankruptcy Judge

Dated:   <u>September 26, 2006</u>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| BONNIE J. CALDWELL | : |
| DEBTOR | : BANKRUPTCY NO. 04-33366 SR |
| | : |
| | : |
| BONNIE J. CALDWELL | : |
| PLAINTIFF | : |
| V. | : |
| | : |
| CONTINENTAL AMERICAN INSURANCE | : |
| CO. F/K/A UNITED STATES LIFE INSURANCE | : |
| CO. | : |
| AND | : |
| | : |
| DISABILITY REINSURANCE MANAGEMENT | : |
| SERVICES, INC. | : |
| | : |
| DEFENDANTS | : ADV. NO. 05-00111 |
| | : |

# ORDER

**And Now**, after trial of this adversary proceeding and for the reasons set forth in the attached Opinion, it is

**Ordered,** that judgment on the Plaintiff's complaint is granted in favor of the Defendants, and against the Plaintiff. The Defendants' termination of benefits was justified, they have no obligation to provide further benefits to the Plaintiff, and their recoupment of the overpayment of benefits to the Plaintiff was permitted and not in violation of the automatic stay; and it is further:

**Ordered**, that judgment on the Defendants' counterclaims is granted in favor of the Plaintiff and against the Defendants. The outstanding balance of the benefits overpayment is determined to be $8,228.00, however, it is a general unsecured claim, and

the Defendants' request that it be declared non-dischargeable is Denied.


BY THE COURT:




STEPHEN RASLAVICH
DATED: September 26, 2006            UNITED STATES BANKRUPTCY JUDGE

**MAILING LIST:**

Counsel for Plaintiff
Ronald H. Beifeld, Esquire
14 E. Germantown Pike
Plymouth Meeting, PA 19462

Counsel for Defendants
Amy E. Vulpio, Esquire
White & Williams
1800 One Liberty Place
Philadelphia, PA 19102

George M. Conway, III, Esquire
Office of the United States Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107